FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2013 AUG -5  P 12: 39

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

CHARLES SCHWAB & CO., INC., :
211 Main Street :
San Francisco, California 94105 :
:
    Plaintiff, :
:
v. :  CIVIL ACTION NO: 1:13cv 949
:
JOSHUA WINSTON, :  CMH IDD
13467 Lake Shore Drive :
Oak Hill, Virginia 20171 :
    Defendant. :
_____ :

## VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff Charles Schwab & Co., Inc. ("Schwab") hereby brings the following Complaint

for a temporary restraining order and/or a preliminary injunction pending arbitration on the

merits against Defendant Joshua Winston ("Winston") for: (1) breach of contract, (2)

misappropriation and misuse of trade secrets, (3) breach of duty of loyalty, and (4) unfair

competition, and in support thereof alleges as set forth below.

This is a case about a former Schwab employee who misappropriated proprietary client

information in preparation to compete unfairly with Schwab and then lied to his manager about

it.   When confronted with proof of his misconduct, the employee refused to answer further

questions and told his manager to direct questions to his lawyer.  Schwab requests emergency

injunctive relief to compel the return of the wrongfully stolen data, to enjoin the employee from

breaching his non-solicitation agreement pending arbitration on the merits, and to compel the

parties to arbitrate in accordance with the terms of their arbitration agreement.

## I. **THE PARTIES**

1.      Schwab is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California.

2.      Winston is a former Schwab employee, who was employed as a Financial Consultant in Schwab's office located at 1650 Tysons Blvd., Suite 150, McLean, Virginia 22102. Schwab is informed and believes and thereupon alleges that Winston is a resident and citizen of the State of Virginia, and resides at 13467 Lake Shore Drive, Oak Hill, Virginia 20171.

## II. **JURISDICTION AND VENUE**

3.      Subject matter jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. § 1332.   The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship. Injunctive relief is sought pursuant to Federal Rule of Civil Procedure 65.

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which the defendant resides and it is the district within which a substantial part of the events or omissions giving rise to plaintiff's claims occurred.

## III. **THE FACTS**

### *Winston's Role at Schwab and Agreements with Schwab*

5.      Winston is a former Schwab Financial Consultant who recently resigned from Schwab and subsequently joined Morgan Stanley Smith Barney, LLC ("Morgan Stanley").

6.      During his employment at Schwab, Winston serviced clients on behalf of Schwab. It bears emphasis that Winston did not develop a "book" of business through cold calls or his own connections in the way that stockbrokers at other brokerage firms often do.  Rather, Schwab provided Winston with pre-existing Schwab clients or qualified leads to service.  As an online

2

discount brokerage firm, Schwab has approximately nine million client brokerage accounts nationwide. Some of these clients have asset levels and needs extending beyond simple online brokerage services.

7. Financial Consultants such as Winston work with clients to help them set goals, determine their financial strategies, and review their progress. Financial Consultants can also help clients arrange to receive a personal financial plan, which is a comprehensive analysis of their financial situation. They also partner with other Schwab employees to provide clients with services ranging from estate planning, to fixed income planning, to education and retirement planning.

8. During his employment at Schwab, Winston was responsible for servicing a group (known as a "practice") of clients that had been developed by Schwab and assigned to him. In this capacity, he serviced hundreds of clients with approximately **$545 million** in assets under Schwab's management.

9. To enable him to service these clients, Schwab provided Winston with access to Schwab's extensive client records and information, including clients' transactional histories, account types, account balances, asset allocations, income, liquid and total net worth, tax status, tax information, investment objectives, and other personal financial information. Schwab paid Winston and provided him with an opportunity to develop, cultivate and maintain relationships with its clients.

10. There is no public source available from which Winston could ascertain the identities and contact information of Schwab's clients, much less the high net worth clients he serviced. The identities of the clients assigned to Winston at Schwab are not generally known to third parties, such as competitor financial services firms. Schwab's customer list would be very

valuable to competitors, such as Morgan Stanley, because it identifies high net worth clients who generate significant revenues and who have demonstrated a need and desire for a specific type of financial service. Schwab's competitors can unfairly benefit from this list because it would enable them to target their financial products, services and marketing efforts to a pre-selected elite group of clients without the need to spend any time, money or resources to identify and develop such clients.

11.    As a condition of employment at Schwab, all employees who interact with clients are required to sign a confidentiality and non-solicitation agreement. In fact, Schwab alerted Winston to this requirement when it first extended Winston an offer of employment in September of 2006. In its offer letter to Winston, Schwab informed Winston that as a condition of employment with Schwab, he would be required to execute a Confidentiality, Nonsolicitation and Assignment Agreement and an addendum thereto. A true and correct copy of the offer letter which is maintained by Schwab in its files is attached as Exhibit A and incorporated herein by reference.

12.    Consistent with the offer letter, Winston executed a Confidentiality, Nonsolicitation and Assignment Agreement and addendum thereto on September 18, 2006 (the "2006 Agreement"). A true and correct copy of the 2006 Agreement which is maintained in Schwab's files is attached as Exhibit B and incorporated herein by reference.

13.    The 2006 Agreement contains several key promises, including Winston's promise (a) not to use or disclose confidential information, which is defined to include the identities of Schwab's clients, their names, addresses, phone numbers, and any account or financial information except as necessary to perform his duties for Schwab; (b) not to solicit Schwab's clients in an attempt to divert business from Schwab; and (c) not to initiate contact with

4

Schwab's clients, including for the purpose of notifying them about any new or subsequent place of employment. See Exhibit B at ¶ 1, 4, 9 and addendum.

14.     Schwab made certain to continually remind Winston of these contractual obligations. To this end, Winston not only executed a confidentiality and non-solicitation agreement when he began employment with Schwab, but from time to time, he renewed his commitment by signing subsequent versions of those agreements. For example, Winston executed additional agreements in 2007, 2008, 2010, 2012, and most recently, at the end of 2012, he executed the "Schwab Confidentiality, Non-Solicitation, and Intellectual Property Ownership Agreement 2013" (the "2013 Agreement"). True and correct copies of the 2007, 2008, 2010, 2012, and 2013 Agreements which are maintained in Schwab's files are attached as Exhibits C through G and incorporated herein by reference.

15.     Winston received valuable consideration for executing the 2013 Agreement, including continued at will employment, extensive compensation, benefits, and he was permitted to participate in Schwab's bonus and incentive compensation plans. Winston received additional valuable consideration from Schwab including Schwab sales support, operational systems, Schwab's goodwill and reputation, and other benefits.

16.     Winston made a number of promises in his 2013 Agreement. The two main promises, which will each be discussed in greater detail below, were: (1) that, except as necessary to perform his duties for Schwab, he would not use or disclose Schwab's customer information, including the identities of its customers, even if he retained this information in his memory; and (2) that he would not solicit or induce clients to divert, transfer, or otherwise take away business from Schwab.

17.    The 2013 Agreement is the agreement that applies to Winston's post-employment conduct and supersedes his prior agreements because it states in pertinent part in paragraph 15 as follows: "It is the parties' intention that this Agreement will supersede all prior agreements relating to confidentiality, non-solicitation, and intellectual property unless a court or arbitration panel finds that this Agreement is not supported by adequate consideration, in which case all prior agreements shall remain in force and effect according to their terms to the full extent permitted by law."

### *Winston's 2013 Agreement Not to Use or Disclose Schwab Customer Information*

18.    In his 2013 Agreement, Winston acknowledged that as a consequence of his employment with Schwab, he would be given access to Confidential Information. See Exhibit G at ¶1. Confidential Information was defined to include "the identities of clients as clients of Schwab; names, addresses, phone numbers, email addresses, account numbers or financial or personal information pertaining to Schwab clients". See Exhibit G at ¶2. Winston also acknowledged and agreed that "Confidential Information does not lose its confidential status merely because I commit it to memory." Id.

19.    In light of this access to Confidential Information, Winston agreed not to assert any claim to it, or to use or disclose Confidential Information during or after his employment with Schwab. See Exhibit G at ¶¶1 and 9.

20.    Further, Winston agreed not to remove any Schwab property, including any Confidential Information, from Schwab except to carry out his duties for the company. See Exhibit G at ¶6. He also agreed that, upon termination of his employment with Schwab, he would immediately return all property and Confidential Information to Schwab. Id.

### *Winston's Post-Employment Obligations to Schwab*

21.     Winston agreed that for a period of 18 months following the end of his employment with Schwab, he would not solicit or induce any Schwab clients whom he serviced or about whom he gained Confidential Information, in an attempt to divert, transfer, or otherwise take away business from Schwab. See Exhibit G at ¶4. The 2013 Agreement provides that "solicitation includes initiating contact with Clients for purposes of notifying them of my new or subsequent place(s) of employment or for purposes of encouraging or inducing them to transfer their accounts to my new firm." Id.

22.     Winston is bound by terms of the Agreements he executed with Schwab.

23.     Winston gave notice of his resignation from Schwab on Monday, July 22, 2013. On that date, he gave notice of his intent to resign by submitting a letter in which he stated "I understand that Schwab expects me to provide four weeks notice of my intended resignation, which I am doing now." A true and correct copy of Winston's resignation letter is attached as Exhibit H and incorporated herein by reference. Winston's reference to Schwab's expectation that he was obligated to provide four weeks notice is an apparent acknowledgement of the notice provision in his 2013 Agreement. See Exhibit G at ¶ 5.

### *The Notice Provision in Winston's 2013 Agreement*

24.     As Winston acknowledged in his resignation letter and through his conduct, he was required to provide Schwab with four weeks notice of his resignation. The purpose behind the notice provision is explained in Winston's 2013 Agreement: "I also acknowledge and understand that my position with Schwab may require me to develop and maintain relationships with Schwab clients, and that the process of cultivating relationships and developing client data and files can take a great deal of time and effort. Consequently, in the event I resign my

employment, in order to help effectuate and ensure an orderly transition, I agree to provide Schwab with notice . . . ."  See Exhibits F and G at ¶5.

25.     The 2013 Agreement goes on to specify Winston's duties and obligations during the notice period.  They include, among other things: "meet[ing] with my manager or his/her designee to review files and other data to help ensure that Schwab personnel are aware of and understand file contents and other relevant client or business related data [and] meet[ing] with my manager or his/her designee to review the status of client accounts and relationships for which I was assigned responsibility to help ensure that client needs may be seamlessly transitioned to and serviced by other Schwab personnel [and] otherwise mak[ing] myself available to Schwab, as requested by my manager, to provide reasonable assistance to effectuate an orderly transition of files, data and client service responsibility prior to my last day of employment."  See Exhibit G at ¶5(b)(ii), (iii) and (v).  As explained in greater detail below, Winston refused to perform these duties.  When he was asked about specific files on his computer, he told his manager that he refused to answer her questions and that she would have to direct her questions to his attorney.

26.     Winston's 2013 Agreement also specifies that during the notice period, he was obligated to return to Schwab all files, data and information relating to Schwab clients or business.  See Exhibit G at ¶5(c)(v) and ¶6.  As explained in greater detail below, Winston failed to do so and thereby breached the 2013 Agreement.

27.     Winston's 2013 Agreement also reflects his acknowledgement that during the notice period, he owed Schwab an unmitigated duty of loyalty.  Id. at ¶5(c).  As explained in greater detail below, Winston has breached his duty of loyalty by placing his interests and that of his new employer, Morgan Stanley, above those of Schwab.

8

### *Schwab's Investigation Upon Receiving Winston's Notice of Resignation*

28.     When Winston presented his letter of resignation to his manager, Nicole Arwood, on July 22, 2013, Ms. Arwood was taken aback by the letter because it suggested that questions concerning Winston's "employment with, and resignation from, Schwab" should be directed to Winston's attorney.  This was not Ms. Arwood's first experience with a resigning Financial Consultant.  At her prior brokerage firm, she had lost a broker under her supervision to Morgan Stanley.  Her experience with that prior departure and her recollection of what she perceived to be that broker's misconduct upon his departure caused her concern.

29.     In addition, it is well known in the securities industry that Morgan Stanley provides substantial six and seven figure signing bonuses to its recruits.  For example, in a recent regulatory notice to all securities brokerage firms, the Financial Industry Regulatory Authority ("FINRA") cited and relied upon an article that stated:

> Bonuses offered by the U.S.'s biggest securities companies to recruit top brokers are reaching their loftiest levels since the financial crisis....The brokerage arms of banks such as Morgan Stanley...are offering high-end U.S. brokers two to three times the commissions and fees they produced in the previous year, up from about one times those earnings previously....The bonuses, which can approach $15 million for some teams over several years, have steadily escalated....A typical high-end broker with a clean regulatory record who generates $1 million of annual revenue and oversees about $150 million of client assets generally gets an upfront cash payment of 1.25 to 1.50 times trailing 12-month revenue.

A true and correct copy of the FINRA Regulatory Notice and article cited within it are attached as Exhibit I and incorporated herein by reference.

30.     Using the framework cited by FINRA and widely understood within the industry, and recognizing that Winston was assigned a practice by Schwab with approximately **$545 million** in assets under management to service, Schwab has significant and legitimate cause for concern.  Schwab believes and therefore alleges that Morgan Stanley has provided Winston with

an upfront bonus and/or forgivable loan equal to hundreds of thousands of dollars and/or more, and the amount of that bonus and/or loan will grow in size depending upon the amount of assets that Winston succeeds in transferring from Schwab to Morgan Stanley.

31.     On July 23rd, Winston was out of the office, but he returned on July 24th.  On July 24th, Ms. Arwood provided him with a copy of his 2013 Agreement and a copy of an email that she had sent him outlining her expectations of him during the notice period.  A true and correct copy of the email is attached as Exhibit J and incorporated herein by reference.  She reviewed the email with him in person.  Among other things, the email confirmed that Winston was obligated to return to Ms. Arwood "all files, data and information relating to Schwab clients or business" including "any documents reflecting the names, addresses, phone numbers, email addresses, or any other information concerning the clients you serviced during your employment at Schwab." See Exhibit J.  Winston stated that he had nothing to return.

32.     Based on her prior experience with a broker resigning to join Morgan Stanley, Ms. Arwood wanted Schwab to investigate further.  Based on Schwab's experience with other brokers hired by Morgan Stanley from Schwab across the country and in order to ensure the security of Schwab's customers' information, Schwab wanted to investigate further.  Upon a review of the computer used by Winston at Schwab, disturbing evidence was uncovered.

### *Winston's Theft of Confidential Information and Intent to Solicit Clients*

### *– The "Prioritize 2013 v2.xls" Files –*

33.     To verify the security of Schwab customer information, Schwab reviewed Winston's computer and activity.  As part of this review, Schwab inspected multiple versions of an Excel file on his computer entitled "Prioritize 2013 v2.xls."  One version of this file contained five separate worksheets within it.  The five worksheets were entitled: "start," "1," "2," "3," and

"4." The "start" worksheet contained a plethora of information that qualifies as "Confidential Information" pursuant to the 2013 Agreement including 206 client names, market values, bank deposits, types of accounts held at Schwab, loan amounts, average basis points generated on the assets held at Schwab, and the clients' addresses, phone numbers and email addresses. The remaining worksheets (i.e., worksheets "1," "2," "3," and "4") contain the same information as set forth in the "start" worksheet, but they are broken down into separate groups, and prioritized in some fashion. A true and correct copy of the "Prioritize 2013 v2.xls." file is attached as Exhibit K and incorporated herein by reference. Exhibit K has been redacted in part to protect client confidentiality.

34.     On June 10, 2013, Winston printed excerpts from worksheets "1," "2," "3," and "4." True and correct copies of the excerpts printed by Winston are attached as Exhibit L and incorporated herein by reference. The names of clients on Exhibit L have been redacted to protect client confidentiality.

35.     Sometime after printing Exhibit L (which are excerpts from Exhibit K), Winston deleted the proprietary customer data contained in Exhibit K and replaced it with innocuous, non-proprietary content unrelated to clients, an example of which follows:

| | Items to focus on | |
|---|---|---|
| | | Penetration in active and |
| 1 | Re-address Practice | marketing |
| 2 | Manage Advised Practice | Mags |
| 3 | Manage Indy Practice | |
| 4 | Referrals | Community Involvement |
| 5 | Local Marketing | Where to advertise more |
| 6 | Seminar Strategy | What alliances can I make |
| 7 | Service and Operations | how to better serve each client |
| 8 | Revenue and comp plan | what is the relationship |
| | Market and Product | |
| 9 | Knowledge | RICP Designation |
| 10 | Daily Focus | Ask each client what is important |

In other words, Schwab alleges upon information and belief as follows: Winston knew that Schwab would inspect his computer after receiving his resignation and would look for deleted files. Rather than leave a deleted file behind, he used the "Prioritize 2013 v2.xls." file to temporarily house the client data he intended to misappropriate believing Schwab would not uncover his scheme.

36.     As noted above, paragraph five of Winston's 2013 Agreement required him to "meet with [his] manager or his/her designee to review files and other data to help ensure that Schwab personnel are aware of and understand file contents and other relevant client or business related data . . . ." Accordingly, on July 29, 2013, during his notice period, Ms. Arwood sat down with Winston and asked him about the "Prioritize 2013 v2.xls." file (Exhibit K). Winston said that he created it to help with practice management and organization. He admitted that he had printed it many times. He said that any copies that he printed would be in his desk. Ms. Arwood had thoroughly inspected Winston's desk, and there were no copies of Exhibit K in his desk. She reviewed Exhibit L with Winston and asked whether he had printed Exhibit L. Winston said yes and that it too was in his desk. Ms. Arwood had thoroughly inspected Winston's desk, and there were no copies of Exhibit L in his desk.

37.     Ms. Arwood asked Winston to explain what the numbers meant on Exhibit L. He stated that they were account values. Ms. Arwood stated that his explanation was implausible because one customer had the number "1" beside his name, and clearly a customer would not be in his practice with one dollar in his account. She also pointed out that many of the accounts had identical dollar amounts in ascending value beside their names. She then pointed to the column heading "My Preferred Contact Link" and remarked that in her experience this looked like some sort of a target list. She asked if he shared this list with his soon to be new employer Morgan

Stanley. At this point, Winston responded by saying that he did not plan to answer that question and directed Ms. Arwood to talk to his attorney.

-- *__The Print Screens__* --

38.     The "Prioritize 2013 v2.xls" file was not the only wrongful conduct discovered by Schwab as part of its investigation. Specifically, Schwab discovered that Winston captured over four hundred "print screens" of highly sensitive client information from Schwab's MARS and Client Central databases in the month leading up to his resignation from Schwab. As used in this paragraph, the phrase "print screen" refers to the key found on a computer keyboard that, when pressed, causes the contents currently displayed on the computer screen to be captured as an image. That image can then be pasted into several document formats such as Microsoft Word or Excel, among others, allowing the image to be printed. The MARS database is available to Financial Consultants like Winston and contains a wide variety of proprietary client information. Client Central is another authoritative source for client data, and is Schwab's primary tool used to serve clients. Client Central is a repository for many different customer documents and information. Client Central is made available to Financial Consultants in order to assist them in servicing clients.

39.     The print screens captured by Winston are disturbing for their content and the manner in which they were captured. First, attached as Exhibit M and incorporated by reference are true and correct copies of various sample print screens captured by Winston from Schwab's MARS database (redacted in part to protect client confidentiality). A review of Exhibit M shows the contents of the print screens: client names; account numbers; social security numbers; account balances; dates of birth; addresses; home, work and cell phone numbers; email addresses; household ID numbers; customer ID numbers; wealth tiers; account types;

identifications of trustees; and account activities. Secondly, the manner in which they were captured by Winston is equally alarming. Winston clearly acted with deliberate intent as he consistently dedicated a large amount of time during his employment with Schwab – i.e., while he was being paid to be a loyal Schwab employee – to capture these images and there is no legitimate reason within the scope of Winston's duties for Schwab that would cause Winston to capture this data from these databases through print screens. He captured 85, 63 and 153 screen prints on June 25th, 26th and 27th respectively. He captured another 159 screens on July 1st, 2nd and 3rd. In short, he methodically gathered proprietary client data pertaining to hundreds of Schwab clients, which constitutes "Confidential Information" under his 2013 Agreement that he is bound not to use or disclose except for the sole purpose of performing his duties on behalf of Schwab.

40.    When Ms. Arwood sat down with Winston on July 29, 2013, after she asked him about the "Prioritize 2013 v2.xls" file, she asked him about the 400+ screen prints. She asked him if he ever did a print screen from his computer. However, Winston refused to answer even a single question about the print screens. Ms. Arwood persisted and tried to ask him questions, but as to each question she asked, similar to her questions about the "Prioritize 2013 v2.xls" file, he repeatedly refused to answer and told her to talk to his attorney.

41.    Concerned about his refusal to answer questions about the print screens and the "Prioritize 2013 v2.xls" file, Ms. Arwood asked Winston directly, "Do you have any information related to clients in your possession?" Winston said, "I don't plan to answer this. Talk to my attorney." Ms. Arwood asked, "Are you going to call clients?" Winston again refused to respond. At that point, Ms. Arwood told Winston his services would no longer be needed at Schwab, and he could return at a later date to retrieve his personal belongings.

42. The next day, July 31, 2013, Winston's attorney sent Schwab's attorney a letter, a true and correct copy of which is attached as Exhibit N and incorporated herein by reference. The letter grossly mischaracterized the July 29 discussion between Ms. Arwood and Winston and audaciously complained that Ms. Arwood asked Winston about the proprietary data he had stolen from Schwab.

43. Schwab's attorney responded with a letter that same day, a true and correct copy of which is attached as Exhibit O and incorporated herein by reference. Schwab's attorney pointedly demanded that (a) Winston return the stolen information and (b) Winston's attorney confirm that Winston will not solicit, including by initiating any contact with, any of the clients he serviced during his employment at Schwab, for a period of 18 months following the termination of his employment.

44. The next day, August 1, 2013, Winston's attorney responded with another letter that continued to distort and misrepresent the discussions that took place between Ms. Arwood and Winston, and also evaded the demands and inquiries set forth in the letter sent by Schwab's attorney (i.e., Exhibit O). A true and correct copy of the August 1, 2013 letter from Winston's attorney is attached at Exhibit P and incorporated herein by reference.

45. Upon receiving Exhibit P, Schwab's counsel responded by email stating as follows: "When will Mr. Winston/[Morgan Stanley] return and purge Schwab's customer information? Is Mr. Winston going to solicit/initiate contact with the clients he serviced at Schwab? Your failure to answer these questions directly will result in legal action. Please ensure you are available for a court appearance in the U.S. Eastern District of Virginia." A true and correct copy of the email from Schwab's counsel is attached as Exhibit Q and incorporated herein by reference.

46.     At this time, it is clear injunctive relief is necessary.  Absent judicial intervention,
Winston will not return the stolen property and he is going to solicit Schwab's clients in violation
of his contractual agreements.

47.     There is no public source available from which Winston or any third party could
ascertain the identities of Schwab's clients through proper means.

48.     Schwab takes numerous steps to preserve the confidentiality of its client
information.  In addition to requiring employees to sign agreements such as those described
above, these steps include implementing additional policies and procedures to preserve and
safeguard confidential customer information.   For example, Schwab trains its employees
concerning their obligations to protect client information.   Schwab also has a centralized
management operation with managers responsible for monitoring outgoing correspondence that
assists in protecting against the wrongful dissemination of proprietary information.  Schwab also
has an online system that is designed to detect and flag outgoing emails that contain customer
information.

49.     Schwab has a "Code of Business Conduct and Ethics" (the "Code").  The Code
has a specific section on "Confidentiality of Client Information" which provides: "Information
concerning the identity of clients and their transactions and accounts is confidential.  Such
information may not be disclosed to persons within the company except as they may need to
know it in order to fulfill their responsibilities to the company.  You may not disclose such
information to anyone or any firm outside the company" except in very limited circumstances
that do not apply here.  A true and correct copy of the Code is attached as Exhibit R and
incorporated herein by reference.  The Code also states: "You have the responsibility to
safeguard proprietary information of the company and comply with the company's

Confidentiality, Non-solicitation and Intellectual Property Ownership Agreement, the terms of which are a condition of your employment." In addition, passwords are required to access client records and information on the Schwab computer system.

50.    The books, files and records of Schwab, and especially the data pertaining to Schwab's clients, constitute confidential and trade secret information.

51.    This information derives independent economic value because it is not generally known to competitors who can profit from its use or disclosure. Schwab has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

52.    Schwab has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including assigning computer access passwords to be used to access Schwab computer systems and records, restricting access to its business premises, implementing policies such as those described above, and having employees, including Winston, sign agreements which expressly prohibit the use and disclosure of such information outside of Schwab.

53.    Winston's conduct was not privileged, and has resulted in great and ongoing damage to Schwab.

54.    Schwab believes and therefore alleges that unless enjoined from doing so, Winston will otherwise engage in the wrongful and unlawful use and disclosure of Schwab's Confidential Information and solicitation of Schwab's clients.

55.    Because Winston is a person currently associated with a Financial Industry Regulatory Authority ("FINRA") (formerly known as the NASD) member firm, the parties have agreed and are obligated to arbitrate the merits of the claims presented herein before FINRA

Dispute Resolution pursuant to the FINRA Code of Arbitration Procedure. However, the FINRA Code of Arbitration Procedure Rule 13804 provides that any party seeking preliminary injunctive relief must do so exclusively in a court of competent jurisdiction. Rule 13804 further provides that when a court grants injunctive relief, an expedited hearing on the merits of a permanent injunction will be commenced within fifteen days. Concurrent with the filing of this civil action, Schwab has commenced an arbitration action against Winston before FINRA.

56.    Rule 13101(b) of the FINRA Code of Arbitration Procedure states that "[w]hen a dispute is submitted to arbitration under the Code pursuant to an arbitration agreement, the Code is incorporated by reference in the agreement." Thus, the FINRA Code of Arbitration Procedure is part and parcel of the agreement to arbitrate between Schwab and Winston.

57.    Winston and Schwab agreed by contract to modify the terms of their arbitration agreement to provide for expedited deposition and document discovery in proceedings such as this one where Schwab is seeking injunctive relief to enforce the terms of the 2013 Agreement. Specifically, paragraph 12 of the 2013 Agreement provides in pertinent part as follows:

> **I agree that in any proceeding alleging breach of this Agreement (whether in court or in arbitration), each party shall have the right to engage in deposition and document discovery**, and Schwab shall have the right to conduct forensic examination(s) of any computers and/or electronic devices in my possession or control, if Schwab reasonably believes such devices contain Confidential Information and/or Intellectual Property. I further agree that in connection with any application for injunctive relief, discovery shall be conducted **on an expedited basis**. If any dispute under this Agreement is arbitrable, then I understand my agreement to engage in discovery as outlined in this paragraph is **an essential term of my arbitration agreement** with Schwab, and these provisions are intended to supplement and modify any applicable arbitration rules.

58.    Accordingly, Winston has contractually agreed that Schwab is entitled to deposition and document discovery in aid of injunctive proceedings in court. He also agreed

Schwab may inspect his computer and electronic devices. In addition, if Schwab is granted temporary injunctive relief in court, the parties must be compelled to arbitrate in accordance with the terms of their arbitration agreement, which includes the FINRA Code of Arbitration Procedure as modified by paragraph 12 of the 2013 Agreement. Consequently, any injunction issued by the court triggering a 15-day hearing under FINRA Rule 13804 should likewise direct Winston to produce documents and sit for a deposition on an expedited basis.

**COUNT I**
**BREACH OF CONTRACT**

59.     The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

60.     By virtue of the foregoing conduct, Winston has violated his Agreements with Schwab.

61.     Winston has breached his contractual obligation not to use or disclose Schwab's confidential information and to cooperate with Schwab during his notice period. By his actions and words, and his counsel's refusal to provide clear assurances in response to Schwab's requests, Winston has made clear his intent to solicit Schwab's clients in violation of his contractual obligations to Schwab.

62.     As a consequence of the foregoing, Schwab has suffered and/or will continue to suffer and/or will imminently suffer irreparable harm and loss.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS**
**Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 et seq.**

63.     The allegations of Paragraphs 1 through 62 are incorporated herein by reference with the same force and effect as if set forth in full below.

19

64.     The books, files and records of Schwab, the confidential information contained therein, and especially the data pertaining to Schwab customers, including customers' names, addresses, phone numbers, account information, as well as additional information such as customers' social security numbers, account numbers, financial status, financial statements, investment objectives and preferences, assets and/or securities held by these customers, and other highly confidential personal and financial information, are trade secrets of Schwab subject to protection under Virginia trade secret law.

65.     This information derives independent economic value by not being accessible, through proper means, to competitors such as Winston and Morgan Stanley, which can profit from its use or disclosure.  The identities of Schwab's clients are not readily available to the public or to Schwab's competitors.  Schwab has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

66.     Schwab has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including assigning computer access passwords to be used to access Schwab computer systems and records, restricting access to its business premises, and having employees, including Winston, sign agreements which expressly prohibit the use and disclosure of such information outside of Schwab.

67.     The foregoing conduct of Winston constitutes a conversion and misappropriation and misuse of Schwab's confidential, trade secret information in violation of Virginia law because Winston has used and/or disclosed Schwab's customer information without Schwab's consent and despite the fact that Winston acquired knowledge of this information under

circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Winston owed Schwab as its agent, employee and representative.

68.     As a consequence of the foregoing, Schwab has suffered and/or will continue to suffer and/or will imminently suffer irreparable harm and loss.

**COUNT III**
**BREACH OF DUTY OF LOYALTY**

69.     The allegations of Paragraphs 1 through 68 are incorporated herein by reference with the same force and effect as if set forth in full below.

70.     Winston had, and continues to have, a common law duty of loyalty arising as a result of his relationship as an employee, agent and/or representative of Schwab.

71.     Winston had a confidential relationship with Schwab.

72.     Winston has used and threatens to continue using for his own benefit the customer information he gained as a result of his employment with Schwab, and is doing so for the purpose of contacting and soliciting Schwab clients to transfer their accounts to his new competing firm.

73.     While he was an employee of Schwab, Winston was asked direct questions by his supervisor concerning the whereabouts of proprietary client information and his intentions for using that information in the future.  While he was still employed by Schwab, he lied to his supervisor in response to those questions, and refused to return that information and the records to Schwab.

74.     The foregoing constitutes a violation of Winston's duty of loyalty to Schwab.

75.     As a consequence of the foregoing, Schwab has suffered and/or will imminently suffer and/or will continue to suffer irreparable harm and loss.

## COUNT IV
## UNFAIR COMPETITION

76.     The allegations of Paragraphs 1 through 75 are incorporated herein by reference with the same force and effect as if set forth in full below.

77.     The foregoing conduct of Winston constitutes an unfair method of competition.

78.     As a consequence of the foregoing, Schwab has suffered and/or will continue to suffer and/or will imminently suffer irreparable harm and loss.

## COUNT V
## INJUNCTIVE RELIEF

79.     The allegations of Paragraphs 1 through 78 are incorporated by reference herein with the same force and effect as if set forth in full below.

80.     By virtue of the foregoing, Schwab has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Winston.

81.     Unless Winston is temporarily and/or preliminarily enjoined from the foregoing conduct, Schwab will be irreparably harmed by:  (a) disclosure and misuse of trade secrets, customer lists, and/or other confidential information that is solely the property of Schwab and its clients; (b) loss of confidentiality of the information contained in clients' records, loss of confidentiality of clients' financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; (c) loss of personnel, damage to office stability, and a threat to the enforcement of reasonable contracts; and (d) present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

82.     Schwab has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the foregoing acts and conduct complained of in Counts I through V, Schwab demands a temporary restraining order and/or a preliminary injunction pending the outcome of an expedited arbitration hearing to be held pursuant to Rule 13804 of the Financial Industry Regulatory Authority Code of Arbitration Procedure, and respectfully requests:

(1) A temporary restraining order and/or a preliminary injunction issue enjoining Defendant, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Morgan Stanley, from:

(a) soliciting any business from, or initiating any further contact or communication with, any client of Schwab whom Defendant serviced or about whom he gained Confidential Information (the "Customers"), including for the purpose of notifying them of his new or subsequent place of employment or for purposes of encouraging or inducing them to transfer their accounts to his new firm (excluding members of Defendant's immediate family and any customers who have signed account transfer forms);

(b) using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business or initiation of any contact with Schwab clients, the information contained in the records of Schwab, or other information pertaining to Schwab clients, including, but not limited to, the names, addresses, phone numbers, email addresses, personal data and financial information of the clients (excluding members of Defendant's immediate family and any customers who have signed account transfer forms);

23

(c)     destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) in Defendant's possession or control which were obtained from, or contain information derived from, any Schwab records, which pertain to Schwab's clients, or which relate to any of the events alleged in the Complaint in this action.

(2)     Defendant, and anyone acting in concert or participation with him, including his counsel, and any agent, employee, officer or representative of Morgan Stanley, be further ordered to return to Plaintiff's counsel any and all records or information pertaining to the Customers, whether in original, copied, computerized, handwritten or any other form, and to purge any such information from his possession, custody, or control, within 24 hours of notice to Defendant or his counsel of the terms of the Court's Order; provided, however, that any information in computerized or electronic form in Defendant's possession, custody, or control (including but not limited to personal computers, computers, Blackberries, iphones, iPads, mobile computing devices and/or telephones, compact or floppy discs, flash or thumb drives, memory cards, hard drives and any other device or media in, or on, which data can be electronically stored) shall be provided by Defendant to his counsel within 24 hours of notice to Defendant or his counsel of the terms of the Court's Order, and Defendant's counsel shall preserve the integrity of such data, devices and storage media, and shall immediately (and in no event later than 7 calendar days after the entry of the Court's Order) make any and all such data, devices and media available for inspection, imaging and duplication by Plaintiff's counsel and/or Plaintiff's computer forensic consultants. After imaging and inspection of the electronic devices

by Schwab, any Customer information shall be deleted and/or purged from the devices by Schwab.

(3)     The parties be ordered to proceed toward an expedited arbitration hearing on the merits: (a) before a duly appointed panel of arbitrators in accordance with Rule 13804 of the Financial Industry Regulatory Authority Code of Arbitration Procedure; and (b) in accordance with the terms of paragraph 12 of the Defendant's 2013 Agreement with Schwab.

(4)     That Winston be ordered to sit for a deposition no later than three business days prior to the FINRA 13804 hearing as required by the Federal Arbitration Act and paragraph 12 of the 2013 Agreement.

(5)     That Winston be ordered to produce responsive, non-privileged documents in response to no more than five document requests no later than 48 business hours prior to his deposition.

(3)     Any other relief that the Court deems appropriate and proper.

Dated:  August 5, 2013                    Respectfully submitted,

Timothy M. McConville (VSB No. 40099)
Hans P. Riede (VSB No. 75352)
Odin, Feldman & Pittleman, P.C.
1775 Wiehle Avenue, #400
Reston, Virginia 20190
703-218-2119 (direct-dial)
703-218-2160 (fax)
Email: timothy.mcconville@ofplaw.com
           Hans.riede@ofplaw.com

*Attorneys for Plaintiff*
*Charles Schwab & Co., Inc.*

Michael R. Greco
(Subject to Admission pro hac vice)
Fisher & Phillips, LLP
Radnor Financial Center
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Telephone: 610-230-2131
Facsimile: 610-230-2151
Email: mgreco@laborlawyers.com

#2153870.2

## VERIFICATION

I, NICOLE ARWOOD, verify that I am a Vice President and Branch Manager of Charles Schwab & Co., Inc. ("Schwab"), I was the Manager and supervisor of Joshua Winston until he resigned from Schwab. I hereby confirm and verify that the facts set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief, except (1) where expressly stated to be based upon information and belief, in which case, I believe them to be true, and (2) legal conclusions, for which I expressly defer to Plaintiff's counsel. I understand that false statements herein are subject to the penalties of 28 U.S.C.A. § 1746 relating to unsworn declarations to authorities.

Nicole Arwood