UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

CHARLES SCHWAB & CO., INC.,    )
                               )
          Plaintiff,           )  Case No. 1:13-cv-949
                               )  Alexandria, Virginia
          v.                   )
                               )  August 6, 2013
JOSHUA WINSTON,                )  10:28 a.m.
                               )
          Defendant.           )
_____

TRANSCRIPT OF HEARING

BEFORE THE HONORABLE CLAUDE M. HILTON

UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff:       Timothy M. McConville, Esq.
                           Michael R. Greco, Esq.

  For the Defendant:       Steven M. Levine, Esq.
                           Jonathan C. Thau, Esq.

  Court Reporter:          Tracy L. Westfall, RPR, CMRS, CCR

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1               P R O C E E D I N G S

2          THE CLERK:  Civil action 2013-949, *Charles Schwab &*

3  *Co., Inc. v. Joshua Winston*.

4          MR. MCCONVILLE:  Good morning, Your Honor.  The

5  defendant's counsel is outside.  Oh, there they are.  We're

6  good.

7          THE COURT:  All right.

8          MR. MCCONVILLE:  Good morning, Your Honor.  My name is

9  Timothy McConville.  I'm with the firm of Odin, Feldman &

10  Pittleman in Reston.  We're here on behalf of Charles Schwab &

11  Co. in the matter before the Court today.

12          Thank you, Your Honor, for hearing us on an emergency

13  basis.  Very much appreciate the Court making himself available

14  this morning.

15          I'm joined, on behalf of Charles Schwab & Co., by

16  Michael Greco.  Mr. Greco is a member of the bar in

17  Pennsylvania.  He's admitted to practice before the United

18  States District Court for the Eastern and Middle Districts of

19  Pennsylvania as well as the District of Colorado.

20          Your Honor, we've moved for Mr. Greco's admission pro

21  hac vice.  That motion's currently pending before the Court.

22  With the Court's permission, Mr. Greco will appear this morning

23  and argue.

24          THE COURT:  That motion's granted.  If I haven't

25  entered the order already, I'll do so.

1          MR. MCCONVILLE:  Mr. Greco, Your Honor, will argue for

2     Charles Schwab.

3          MR. LEVINE:  Good morning, Your Honor.  Steven Levine

4     from LevineCarita, PLC here in Alexandria.  I am counsel for

5     Defendant Winston.  And with me today I have Jonathan Thau who

6     is a member of the bar of New York, also a member of the United

7     States District Court for the Southern District of New York, and

8     a member of the Second Circuit U.S. Court of Appeals.

9          I would like to move the admission of Mr. Thau for the

10    purpose of this hearing.  Our application did not get

11    electronically filed yesterday, but it will be done as soon as

12    this hearing is over and I get back to the office.

13         THE COURT:  Very well.  Your motion is granted as well.

14         MR. LEVINE:  Thank you.  And I think Mr. Thau does have

15    a preliminary matter on subject matter jurisdiction if the Court

16    wants to hear that first?

17         THE COURT:  If you want, that will be fine.

18         MR. THAU:  Thank you, Your Honor.  I appreciate having

19    the opportunity to be heard.  Understanding this is a

20    preliminary matter, I'll try to confine my remarks to the

21    subject matter aspect of the case right now, and I hope to have

22    an opportunity to address any other issues after Mr. Greco has

23    the opportunity.

24         Your Honor, first of all, this case is heading to

25    arbitration.  Everybody agrees to that.  There's an allegation

1    in the complaint that somehow the Court needs to order the

2    parties to arbitration.  My client, Mr. Winston, is what's known

3    as an associated person, meaning he was an employee of Charles

4    Schwab, the plaintiff.  He does not contest that this matter,

5    the merits of the case have to go to arbitration.

6            So there's no justiciable issue before this Court.  I

7    don't think Mr. Greco believes that there is.  Mr. Greco and I

8    have dealt with each other in other cases.  But just to be

9    clear.  That's not in dispute before this Court.

10           Mr. Winston gave a notice of intended resignation, Your

11   Honor, on July 22nd.  The contract that Schwab has put before

12   you purports to impose on an employee a four-week notice period

13   where you have to tell Schwab that you're going to leave and you

14   have to be prepared for that four-week period to help, if they

15   want you to, to transition business.

16           Mr. Winston had intended to go to Morgan Stanley,

17   another securities firm.  Mr. Winston agreed to honor the notice

18   period, gave his notice, agreed to come back to the Schwab

19   office on several occasions and did.  There's some disagreement

20   between the parties perhaps about what he was asked to do or not

21   and whether it was appropriate or not, which I'd be happy to

22   address.

23           But last Friday, Schwab told Mr. Winston -- or actually

24   told my firm -- he's no longer employed by Schwab.  He then

25   started work at Morgan Stanley, but he had been prepared at all

1   times to continue to honor the notice period.  Now, Your Honor,

2   the complaint in this case purports to predicate jurisdiction on

3   the following basis, that there is diversity of citizenship and

4   an amount in controversy in excess of $75,000, which are the two

5   prerequisites.

6        There is no doubt Charles Schwab is a California

7   corporation.  Mr. Winston resides and worked for Schwab in

8   Virginia.  There is diversity.  But we do fundamentally

9   question, Your Honor, on this factual record as to how there

10  could possibly be $75,000 in controversy.

11       When you read the papers that were submitted yesterday

12  to the Court, there is not a single allegation, Your Honor, that

13  even one account has transferred from Charles Schwab to

14  Mr. Winston's new employer, Morgan Stanley.  There has to be

15  some reasonable quantification under which you can get to the

16  $75,000 in controversy.  There is no allegation that any

17  business has been lost.  There is no allegation that even a

18  single account has been transferred.

19       There is case law, as I'm sure Your Honor is aware,

20  that you may be able to argue that an injunction could have some

21  monetary efficacy such that an injunction might satisfy the

22  dollar threshold.  But on the factual record before the Court

23  this morning, there is no such finding.  There is no allegation

24  that an injunction would be worth that.  There is no allegation

25  that any clients are about to leave Schwab to go to Morgan

1   Stanley.

2          At this point on this record where Mr. Winston had been

3   honoring his notice period until he was told by Schwab we don't

4   want you here anymore, I do not believe the $75,000 threshold

5   has even remotely been satisfied.

6          One of the points I would make, and Schwab in the

7   papers that were submitted to Your Honor called your attention

8   to a couple of cases in which Schwab had received injunctive

9   relief, suggesting that those cases in fact justified an

10  application for an injunction at this point.  In both of those

11  cases as I read them, the courts issued injunctions several

12  months after the individual had transitioned to another firm.

13         In both cases, for example, the case that was attached

14  to the papers, I believe it's called *Aviles*, 20 to 25 accounts

15  had transferred, and there did not seem to be an issue.  An

16  evidentiary hearing was held, testimony was taken, and there

17  does not seem to be an issue that in fact there was a live

18  controversy.

19         The same thing with the other case, I believe it was

20  called *Karpiak*, that was cited repeatedly in the memorandum of

21  law.  In that case, and I believe Mr. Greco with his prior firm

22  was involved in that case, in that case also, Your Honor,

23  accounts had transferred.  There was a substantial amount of

24  assets that had moved, and there was a justifiable or

25  justiciable controversy.

 1              In this case, Your Honor, nothing of the sort is

 2     presented.  And as the Court is aware, as a threshold matter,

 3     you do need to determine jurisdiction before you can even get to

 4     the issue of the restraining order.  Now, to be clear, this

 5     claim can and -- can be filed before the financial regulatory,

 6     before FINRA, at any time.  I'm assuming at some point Mr. Greco

 7     will actually file papers.  Again, we consent.

 8              But there can't possibly be a jurisdictional basis for

 9     this Court on this record to take any jurisdiction when I don't

10     think that the threshold has been satisfied on the $75,000.

11     Again, the only other allegation about jurisdiction is that the

12     Federal Arbitration Act be invoked to compel arbitration.  But,

13     Your Honor, there is no dispute.  We're prepared to go, and that

14     can't possibly be the basis for dispute in this courthouse.

15     We're prepared to stipulate to going to arbitration, and we're

16     prepared to stipulate to do it today.

17              I'd be happy to address some of the other issues in the

18     matter, but I wanted to make sure that I address that first

19     because I do think it is a matter under the case law that must

20     first be determined by the Court.  We would be happy on an

21     expedited schedule, meaning in the next day or two, to submit a

22     short set of papers dealing with that issue.  One, the legal

23     basis for the objection that we have; and, two, the factual

24     basis with regard to the fact that there hasn't been the kind of

25     activity, there haven't been account transfers or other things,

 1   that could get us to the $75,000 threshold at this point, Your

 2   Honor.   Thank you.

 3        MR. GRECO:   Good morning, Your Honor.   Thank you for

 4   the courtesy of permitting me to argue this morning.

 5        I'm afraid the defendants misunderstand or misinterpret

 6   28 U.S.C. 1332.   The diversity statute doesn't require damages

 7   exceeding $75,000.   The diversity statute requires that the

 8   matter in controversy exceed the sum or value of 75,000.

 9        What the plaintiff has alleged is that the value -- the

10   matter in controversy exceeds the sum or value of 75,000.   We

11   state clearly in the verified petition that Mr. Winston, the

12   defendant in this case, was assigned a practice to service at

13   Schwab that had assets in it exceeding a half a billion dollars,

14   575 -- 575 or 545 -- 545, excuse me, million dollars in assets

15   that generated hundreds of thousands of dollars in revenues,

16   annual revenues, for Schwab on an annual basis.   That's in our

17   verified complaint.

18        So I'm afraid the defendants have misunderstood the

19   diversity statute.   We don't actually have to wait until we've

20   been damaged in order to bring this complaint.   In fact, the

21   Fourth Circuit has specifically said so.   That's exactly why an

22   action for injunctive relief is ripe.   The Fourth Circuit in the

23   *Merrill Lynch v. Bradley* case that we've cited in our memorandum

24   of law says that even an injunction a few days after

25   solicitation has begun is too late because customers can't be

1    unsolicited.  We are here to prevent the solicitation of

2    customers.  Because, and as it says in the defendant's contract,

3    he says, I agree that Schwab is entitled to injunctive relief to

4    prevent threatened solicitation.  We said to the defendant, and

5    it's explained in our papers, when he was in the office his

6    manager asked him, are you going to solicit clients?  And he

7    said, talk to my lawyer.

8           So I wrote a letter to Mr. Thau and I said, is he going

9    to solicit clients?  Mr. Thau didn't respond.  And I sent him an

10   e-mail and I said, we can avoid going to court.  Just answer my

11   question, please.  Is he going to solicit clients?  There was no

12   response to that.

13          So the threatened harm is real and palpable.  And as

14   the Fourth Circuit said in *Merrill Lynch v. Bradley*, even a few

15   days after the solicitation has begun -- he began at Morgan

16   Stanley on Friday afternoon -- that's too late.  You've got to

17   have injunctive relief to stop it.

18          28 U.S.C. 1332, you don't have to have damages.  The

19   matter in controversy must exceed the sum or value of 75,000.

20   So the Court clearly has subject matter jurisdiction.

21          THE COURT:  Yeah, but the matter in controversy is not

22   the total of the account that he had at Schwab.  The amount in

23   controversy is what you will lose if there is solicitation.

24          MR. GRECO:  Correct, Your Honor.  And what we've said

25   is that -- what we have pled in the complaint is that the half

1   billion dollars in assets clearly generate in excess of $75,000

2   in revenues to Schwab on an annual basis.

3          THE COURT:  Well, of course they would, but there's no

4   allegation that he has taken any of those accounts with him.

5          MR. GRECO:  But he's threatening to do so, and that's

6   what we're here to stop.  He's threatening to do so.

7          The matter in controversy is -- and if you look at

8   exhibits to the complaint, Your Honor --

9          THE COURT:  Well, does a threat give me jurisdiction

10  that there's a controversy here?  I mean, he may just be playing

11  around with you.  He may just dislike the fact that you told him

12  something or whatever.

13         MR. GRECO:  But that's what we're here to ask the Court

14  to stop, Your Honor.  If you look at the exhibits to the --

15         THE COURT:  What is there to stop if he hasn't done

16  anything?

17         MR. GRECO:  He's threatening to do it.  We're here

18  asking you to stop him from doing it.  If you look at the

19  exhibits to the complaint, the documents that we've alleged that

20  he's taken, which he will not assure us that -- and if you look

21  at the exhibits to the complaint, he's listed clients with tens

22  of millions of dollars in assets and he's threatening to take

23  that information from us.

24         THE COURT:  What did he do to threaten to do that?

25         MR. GRECO:  Well, Your Honor --

1        THE COURT:  Do you have an exhibit here where he's

2   threatened that?

3        MR. GRECO:  Well, it's detailed in our verified

4   allegations.  If I could proceed to explain to you what happened

5   and you'll understand the threat in complete, if I can do that?

6        THE COURT:  Yeah.

7        MR. GRECO:  So allow me to explain what happened.

8   Mr. Winston is, as you understand now, a former financial

9   consultant at Schwab.  There are two aspects of what we're

10  seeking here today.  One is to enforce his contractual

11  obligation not to use or disclose our confidential information

12  and not to solicit.

13       The second aspect, which I do want to get to later

14  because Mr. Thau did allude to, we agree that this is ultimately

15  arbitrable.  What we would like to ask the Court to do is to

16  compel us to arbitrate in accordance with the terms of our

17  arbitration agreement.  That's a second issue that we do

18  ultimately want to get to with the Court.

19       But focusing on the first part of it, Mr. Winston is a

20  financial consultant.  Unlike brokers at other firms who develop

21  books on their own through cold calling and seminars and so

22  forth, Mr. Winston was assigned this practice, just given this

23  practice to service on behalf of Schwab, over a half billion

24  dollars in assets.

25       His contract says you've got to agree to two things.

1    You have to agree that the information that we give you, names,

2    addresses, phone numbers, all the account information, that's

3    confidential.  You're not going to use it.  You're not going to

4    disclose -- except for --

5            THE COURT:  I think I understand all of that.

6            What I'm having trouble understanding is you've got --

7    in order to get extraordinary relief, injunctive relief, you've

8    got to show some kind of irreparable harm.

9            MR. GRECO:  Imminent --

10           THE COURT:  Now, what has he done that shows there's

11   imminent irreparable harm?  That's what I want to know.  The

12   rest of it I grasp, I think.

13           MR. GRECO:  When he gave notice that he was going to

14   leave, we looked at his computer.  During the notice period, his

15   obligation is to come in and meet with us to review the files.

16   So we looked around at the different files to take stock of what

17   needed to be done in transition.

18           We looked on his computer and we found this

19   spreadsheet, which is exhibit -- I think it's Exhibit K.  It's

20   been redacted.  It's a spreadsheet that has -- it was an unusual

21   spreadsheet.  It caught our attention.

22           It has a list of 206 client names, addresses, phone

23   numbers, what appear to be market values, bank deposits, loans,

24   average basis points.  This is revenues to tell you, you know,

25   the types of revenues that are generated on the accounts.

1      And what was odd about this spreadsheet, Your Honor,

2  what we determined was that ultimately the spreadsheet was saved

3  over and innocuous content was filled in to replace its content.

4  Okay.  And the confidential information was printed and then it

5  was saved over to conceal this confidential information ever

6  existed.  We had to ferret this out and find out that it was

7  there.

8      So we called Mr. Winston in and we said, what is this

9  spreadsheet?  And he said, oh, that was just something that I

10  created for practice management.  And the manager said, well,

11  can you explain to me what information is on here?  And he said,

12  well, those are just account values.  The manager said, well,

13  let's look at -- let's look at Exhibit L.  What is this?  Do you

14  agree that you printed this stuff all out?  And he said, yeah, I

15  did print this all out.

16      Where is it?  He said, in my desk.  She said, it's not

17  in your desk.  Where is it?  He said, it's all in my desk.  It's

18  not in your desk.  Can you explain to me what's in here?  And he

19  said, well, those are account values.  She said, look at Exhibit

20  L.  If you look at Exhibit L, Your Honor, he said, those are

21  account values.  She said, they can't be account values.  This

22  first customer wouldn't have one dollar in your -- in his

23  account.  You service high net worth customers.  Nobody has a

24  dollar in their account.  Look at all of these clients who have

25  similar account values in their accounts.  These aren't account

1    values.  What is this?

2           And then all of a sudden this gentleman, who is

3    supposed to be in his notice period helping us transition the

4    accounts, clams up and says, talk to my attorney, just talk to

5    my attorney.  She said, have you returned everything?  And he

6    said, I'm not going to answer any other questions.  Talk to my

7    attorney.  She says, have you returned everything?  Do you have

8    anything in your possession?  He said, I'm not going to answer

9    any other questions.  Talk to my attorney.  She said, I need to

10   ask you about some other records.

11          This is his notice period.  He's obligated to be

12   answering questions for us.  And there's some more important

13   points that you need to understand.

14          If you look at Exhibit M to the complaint, these are

15   just a few examples.  We found 480 of these on his computer.

16   There are some databases that Schwab has called the MARS

17   database and the client central database.

18          These are databases where you can go to find

19   proprietary information ranging from account numbers to Social

20   Security numbers to prospect leads.  You want it, it's there,

21   you name it.  And if you look at these print screens, these

22   screens that we've given you, these are just a sample of 480

23   that we found.

24          When we looked at his computer, what we found is that

25   over a span of just a few days in the weeks leading up to his

1    resignation, what did Mr. Winston do?  On one day in one

2    afternoon, he sat at his computer and he hit print screen, you

3    know, the print screen button on your keyboard, he hit print

4    screen a hundred and -- I forget the exact number -- 153, 160

5    times, print screen, print screen, print screen, print screen.

6    This is a broker who's responsible for servicing clients.  He

7    wasn't working with 160 clients that afternoon.

8         Then the next day he hit another 100-and-something

9    print screen, print screen, print screen.  And Ms. Arwood, the

10   manager, when sitting down with this broker who's supposed to be

11   answering questions and helping us figure out the files and

12   asking him, why did you do this, what was his response?  I'm not

13   going to answer that question.  You talk to my attorney.

14        So I wrote a letter to Mr. Thau.  I said we believe he

15   has information.  Those letters are attached as Exhibits N

16   through Q to the complaint.  We said we believe he has

17   information.  We want that information returned.

18        And the other thing that Ms. Arwood asked him

19   reasonably under the circumstances, are you going to comply with

20   your contract?  This looks to us like you made a target list and

21   you intend to solicit the clients.  You've just given me notice

22   you're going to a competitor.  I think it was reasonable for her

23   to say to this gentleman, do you intend to breach your contract?

24   Are you going to go solicit?  He said, talk to my attorney.

25        So we directed our questions to his attorney like he

said.  We shouldn't have had to.  He was working for us.  He was our employee.  But we did.  I wrote the letter to Mr. Thau and said answer, please answer those two questions, return the information and is he going to solicit?

Mr. Thau did not answer those questions.  He wrote back and he complained and he said, you're abusing the notice period.  You're using it to conduct mini depositions.  He's our employee, and we have very reasonable suspicions here that the security of very highly proprietary information has been compromised.  I got another letter back saying you're abusing the notice period, conducting mini depositions of our client, even though he, in good faith, availed himself of the notice period.

That, respectfully, Your Honor, is not what happened. We were using the notice period for exactly what the notice period is designed to be used for, to transition this practice and to ensure the security of the information, and all we got from him was talk to my lawyer.  We did talk to his lawyer, and the lawyer still wouldn't answer the question.

I sent then an Exhibit P or Q, I forget which one it is, to the complaint, another e-mail to Mr. Thau saying let me be clear -- this was last Thursday -- you have not answered my two key questions.  What we want is return the records and answer is he going to solicit the clients including by initiating contact with them.  A failure to answer these square on will result in legal action.  Ensure you are ready to appear

1    in the Eastern District of Virginia as early as Monday,

2    Alexandria Division.

3          Still today, as we stand here right now, no answer to

4    those questions.  So when Your Honor looks -- asks me what's the

5    threat they're going to do that, that's the threat.  There's a

6    reason they won't answer those questions.  He is not returning

7    the information.  This is highly proprietary information.  And

8    he intends, if he hasn't already begun over the weekend,

9    Mr. Thau said he began employment on Friday night, he's going

10   to -- he's going to solicit if he didn't begin on Friday night.

11   I'm not there in his office.  I can't be there in his office

12   when he's on the phone.

13         The transfer process, Your Honor, let me explain to you

14   how the transfer process works in the securities industry.  When

15   a client wants to transfer their account, they sign an account

16   transfer form.  Mr. Winston will take that form and go to Morgan

17   Stanley.  Morgan Stanley takes what's called an automated

18   account transfer form, it's an ACAT, they enter it into a

19   system.  It creates a wire.  They send a wire to Charles Schwab.

20   Charles Schwab has to liquidate the assets.  It takes seven to

21   ten days.  Mr. Thau knows this.  It's the ACAT wire process.  It

22   will take seven to ten days for those wires to go back and forth

23   for assets to be wired.

24         By that time, this will be a fait accompli.  It will

25   all be done.  That's why the Fourth Circuit in *Merrill Lynch v.*

1  *Bradley* said even a few days late is too late.  Customers cannot

2  be unsolicited.  Injunctive relief is required now to stop the

3  solicitation.  We cannot wait for the damage to be done.

4       THE COURT:  I don't have any trouble with that.  I'm

5  having trouble finding any evidence that he is soliciting.  Once

6  you have the evidence of solicitation, of course --

7       MR. GRECO:  We don't have to wait for him to actually

8  begin the solicitation.  The fact of the matter is is that I

9  think we have made a prima facie case that he is threatening to

10  breach his contract.

11       THE COURT:  Was that true in the case that you cited to

12  me from the Fourth Circuit that there was simply a threat that

13  there might be solicitation?

14       MR. GRECO:  No.  In the case that I cited you from the

15  Fourth Circuit, the solicitation had happened, but what the

16  Fourth Circuit said in that case -- if I can reach for my brief.

17       THE COURT:  It's nice to say those things after you've

18  got something in front of you that there is some wrongdoing

19  going on, but the trouble I'm having here is that all I have is

20  a suspicion.

21       MR. GRECO:  Well, I think we have more than a

22  suspicion.

23       THE COURT:  -- wrongdoing here.  You don't even

24  know that he -- there isn't any evidence that he has this

25  information or has taken it with him.

1          MR. GRECO:  Your Honor, I think --

2          THE COURT:  -- a lot of computer runs, but you don't

3   have any evidence here that he has taken that information with

4   him, No. 1.  There's no evidence that he's made a call to

5   transfer any account, to solicit any of the business.

6          MR. GRECO:  I think we do, Your Honor.  I think we do.

7   Keep in mind the standards that the Court has to apply.  The

8   standards that the Court has to apply is the likelihood of

9   success.  I don't have an absolute certainty.  I think it's

10  likelihood of success, and the ultimate standard for us to

11  succeed at trial is going to be what's more likely than not.

12          You have an employee here who has indicated that he's

13  leaving to go to a competitor.  And in the face of that, you

14  have an employee who --

15          THE COURT:  People do leave and go to competitors and

16  do not solicit --

17          MR. GRECO:  You're correct.

18          THE COURT:  -- other clients.  We don't know which is

19  going to happen in this case.

20          MR. GRECO:  You're correct.

21          THE COURT:  We know that your former employee's going

22  to somebody new, but the thing we don't know is whether or not

23  he's going to solicit the clients that he had with your company.

24

25          MR. GRECO:  Correct.  But what we do know is that in

1    the days leading up to that resignation, he engaged in highly

2    suspicious activities.  We do know that he gathered information

3    that he had no reasonable basis to gather.  He had implausible

4    suggestions as to why he did it.  When he was queried about it,

5    he clammed up and said talk to my attorney.  When we talked to

6    his attorney, his attorney refused to answer those questions,

7    and still does, and has yet to counter those allegations even

8    though in having sufficient time to do so.

9            And I think that --

10           THE COURT:  Well, I mean, that might be what you're

11   likely to have happen or the easy thing that happened, but -- I

12   mean, just the fact that he says he isn't going to answer you,

13   that doesn't --

14           MR. GRECO:  Pardon me?

15           THE COURT:  -- that doesn't really get you anywhere

16   either.  There's still no solicitation.  There's no use of any

17   confidential information or evidence of it.

18           MR. GRECO:  Well, I think there's evidence of misuse of

19   the information when he is -- there's no legitimate purpose for

20   him to have done what he's done and when.

21           THE COURT:  That was all done within your company.  So

22   as long as it stays within your company, got no problems.

23   Right?

24           MR. GRECO:  Your Honor, when we asked him for his

25   assurance that he hasn't taken them, he refuses to answer and he

1    says --

2            THE COURT:  That's not -- that doesn't qualify as

3    something to give an injunction.  Just because he doesn't give

4    you the right answer to a question, you can't come running in

5    and get an injunction.

6            MR. GRECO:  How can we prove an impossibility then?  I

7    think we're invoking --

8            THE COURT:  How can I go ahead and damage somebody

9    else's career based on no evidence?  Just because you think he

10   won't answer your question, so you think he's going to do

11   something.  So I'm going to enter an injunction against him

12   presuming that he's going to do just what you think he's going

13   to do?

14           MR. GRECO:  Well, I'm not sure -- I think the Court has

15   now waded into a balancing of the harms.  I don't think there

16   would -- damage his career.  We would --

17           THE COURT:  I don't see any harm to you yet.

18           MR. GRECO:  There would be no harm --

19           THE COURT:  I'm not balancing anything.  I cannot find

20   any harm.  That's what I've been talking about.

21           Where have you been harmed one iota?

22           MR. GRECO:  The taking of this information.  I think

23   we've given you sufficient proof to --

24           THE COURT:  No evidence that he's taken it.  The only

25   evidence you have that I see is that he did some things that you

1  think are suspicious that maybe he shouldn't have done.  When

2  you asked him about it, he wouldn't really tell you what he was

3  doing.  Now, we don't know.  But there is no evidence that he's

4  taken that information.

5       I've given you a long time to argue here.  I've looked

6  through these exhibits.  I understand what you're saying.  I

7  understand you have a concern.  Well, your client has a concern.

8  But there's no evidence that anything's happened.  And without

9  some showing of irreparable harm, I cannot consider an

10 injunction, a temporary restraining order or an injunction.

11 That's just premature.

12      Now, what you say may be true.  But now maybe since

13 this issue has been raised, maybe nothing will ever happen.  I

14 don't know.  That would be the best outcome for everybody, I'm

15 sure.  No lawsuit or anything else.  You-all go to arbitration

16 and you won't have to worry about an injunction of any kind.

17      I would say if you had evidence that he is harming you

18 in any way by the solicitation or the use of your trade secrets

19 or confidential information, you'd be entitled to injunctive

20 relief, but I don't find any evidence of that.

21      MR. GRECO:  Okay.  Your Honor, I understand Your

22 Honor's view and obviously respect that.

23      What I would then ask for Your Honor is -- I think you

24 can understand why we have good cause to believe what we

25 believe, and I would ask for the opportunity to prove it.  I

1    think what we need is an opportunity to conduct expedited

2    discovery in aid of our request for a preliminary injunction

3    because we did move for, not only a temporary restraining order,

4    but for a preliminary injunction.

5          We have made extensive argument to Your Honor this

6    morning as to why we believe the defendant did what he did.  And

7    I think that based on the argument -- and you're right.  Your

8    Honor's been very gracious to me and given me extensive

9    opportunity to argue as to what he's been doing and what he's

10    threatened.

11          And if you were to assume that since Friday night he

12    has been soliciting, for the sake of my argument, if we were to

13    assume that everything that I've been arguing is true but I just

14    can't prove it because I haven't been there in his office with

15    him, I haven't been there at his home where he's got the

16    documents and he's doing it, the only way I can do that, to

17    prove it, is through discovery.  I need the opportunity to

18    depose him and to get documents.

19          What I want to point out to Your Honor are some

20    provisions in the contract.  If I could direct the Court's

21    attention to Exhibit G to our complaint for a moment.

22          THE COURT:  All right.

23          MR. GRECO:  In Exhibit G to the complaint, again, this

24    is a promise that was made by the defendant.  It's paragraph 12

25    of the defendant's contract.

 1          Defendant agreed that in any action in which Schwab

 2   seeks to enforce the terms of this agreement, the contract that

 3   we've been talking about this morning, and particularly one

 4   seeking injunctive relief, he consents to discovery on an

 5   expedited basis, and that includes both deposition and document

 6   discovery.

 7          And we would not overreach in the discovery we seek in

 8   aid of our preliminary injunction.  What we would want is an

 9   opportunity to serve five document requests and to depose the

10   defendant, and then to come back to prove the claims that we've

11   sought to prove to Your Honor on an expedited basis.

12          I think that that would be absolutely essential under

13   the Fourth Circuit's decision in *Merrill Lynch v. Bradley*

14   because --

15          THE COURT:  What do you say to expedited discovery

16   on him?

17          MR. THAU:  Your Honor, both sides have told you this

18   morning that this case belongs in FINRA.  FINRA will appoint a

19   three-person arbitration panel as soon as Mr. Greco submits a

20   pleading, which apparently, at least as far as I know, he hasn't

21   done yet.

22          Oh, you did yesterday.  Thank you.

23          We haven't seen it yet.  So he's already filed a

24   proceeding with FINRA.  FINRA has well-developed rules for the

25   conducting of discovery, provides for broad document discovery.

1    Does not provide for depositions as a general matter.

2         This case belongs in FINRA.  There is no reason why

3    Mr. Greco and his client should be getting discovery in court

4    when everybody has told you this morning that the matter is

5    supposed to be before a three-person arbitration panel.

6         Now, Mr. Greco was certainly free when the panel was

7    appointed to make a request that although the rules don't

8    typically provide for depositions, that we think that they be

9    given in this case.  But there's no reason why this case should

10   be now in this Court.

11        By the way, Your Honor, we started out this morning, I

12   think there is in fact a very serious issue as to whether the

13   Court has jurisdiction because we don't think the 75,000 is

14   satisfied on this front, but we're prepared to work with

15   Mr. Greco.  We have cases with Mr. Greco in other circumstances.

16   I've got a case with Mr. Greco right now in another state.

17   There's plenty of opportunity to take discovery according to the

18   FINRA rules.

19        Asking for depositions now in this Court, which, by the

20   way, I think there's a question as to whether the Court even has

21   jurisdiction, that go beyond what FINRA would permit I think is

22   an attempt to do an end-run around the FINRA rules.  So I would

23   respectfully say, no, there should not be expedited or

24   non-expedited deposition in this Court.  Let's move to FINRA

25   where it's supposed to be.

1          This case concerns securities industry standards.  They

2     appoint a three-person panel that's presumptively familiar with

3     standards in the industry, and that's what I think we should be

4     doing, Your Honor.

5          THE COURT:  All right.

6          MR. GRECO:  I need to try your patience a little bit

7     longer.  At the beginning this morning when I began, I said

8     there were going to be two points that we were here before the

9     Court on.  This is the second point.

10          I said we wanted to compel arbitration in accordance

11     with the terms of our arbitration agreement, and this is that

12     point.  So I need Your Honor to bear with me for two minutes as

13     I walk the Court through this.

14          THE COURT:  Why do I have to get involved that?  Aren't

15     you already there?

16          MR. GRECO:  No, because Mr. Thau just walked us into

17     it, but he walked us into it in an incomplete fashion.  I think

18     it's important for the Court to understand this.

19          He suggested we're on our way to arbitration and the

20     arbitrators are going to take care of this.  What he just said

21     to the Court was not entirely complete, and I think the Court

22     needs to understand why the depositions are --

23          THE COURT:  Doesn't really -- if you go to arbitration

24     and you've got the contract that provides for arbitration, and

25     if he doesn't want to come along, that's his problem.

1           MR. GRECO:  I need the depositions now in aid of

2    preliminary injunction proceedings in front of this Court, which

3    Your Honor has denied me a temporary restraining order, if I

4    understand correctly.

5           I've moved for a preliminary injunction as well.  So if

6    I've been denied a temporary restraining order, which I presume

7    I've been denied without prejudice, because if I go home this

8    afternoon and somebody rings my phone and says he's soliciting,

9    I'm assuming I can come --

10          THE COURT:  You know, that's exactly right.  I mean,

11   anytime that you have some evidence you can present, you'd be

12   entitled to come here for a motion for a preliminary -- a

13   temporary restraining order and then a preliminary injunction,

14   but it seems to me that I've got to deny this one.

15          MR. GRECO:  This TRO.

16          THE COURT:  And if you have some evidence later on, you

17   can always come back.  I mean, there's no question about that.

18          But I don't think that it's proper or I should just

19   simply leave open this motion for a preliminary injunction to

20   wait and see what happens.  I think that this aspect of the case

21   needs to be dismissed.

22          Obviously, you can come back.  I mean, if you have some

23   evidence at any time that he's soliciting, or whatever you

24   allege he's doing, you can always come back.  But with that part

25   gone, the only other aspect of this case that's here -- and it

1   is just filed in connection with the preliminary injunction,

2   isn't it?

3         MR. GRECO:  May I explain to the Court why that's not

4   correct, respectfully, Your Honor?  Why this aspect of the case

5   should not be closed because that would be inconsistent with the

6   Federal Arbitration Act?  May I explain to the Court our

7   position on that?

8         THE COURT:  Well, if you're in arbitration --

9         MR. GRECO:  If I could have two minutes just to

10  explain, Your Honor.  There is United States Supreme Court

11  precedent as to why the direction we are now going in is

12  inconsistent with our rights and what our position is, and it's

13  important for me to have the opportunity to explain to Your

14  Honor why what's about to unfold is not correct.

15        THE COURT:  Well, it seems to me you're entitled to two

16  things:  A ruling on your motion for a preliminary injunction.

17  You're also entitled to arbitration because the contract

18  provides for it.  I denied the temporary restraining order and

19  therefore your preliminary injunction because there's no

20  evidence here for either.  And you're going to arbitration.

21  You've already filed for arbitration.

22        MR. GRECO:  But I think we're entitled to arbitrate in

23  accordance with the terms of our agreement.  And I'm --

24        THE COURT:  That would be determined by the arbiter,

25  not by me.

1          MR. GRECO:  No.  I think we're asking for you to compel

2     us to arbitrate in accordance with the terms of our agreement.

3     That's what I'm looking for an opportunity to explain to Your

4     Honor right now.

5          THE COURT:  Well --

6          MR. GRECO:  That's the motion we filed with the Court.

7     If you look at it, it's been denominated as a motion for a

8     temporary restraining order, preliminary injunction, and to

9     compel arbitration in accordance with the terms of the

10    agreement.  That's what I said from the outset.  There was the

11    second part of this that I wanted to explain to Your Honor this

12    morning.

13         THE COURT:  Well, I have a complaint which is entitled

14    Verified Complaint for Preliminary Injunctive Relief.

15         MR. GRECO:  And if you look at our motion, Your Honor,

16    it's denominated a motion, not only for a TRO and PI, but also

17    to compel arbitration in accordance with the terms of the

18    parties' arbitration agreement.

19         THE COURT:  Well, I tell you.  You would have to --

20    you're really going to have to brief that for me --

21         MR. GRECO:  It is briefed.

22         THE COURT:  -- because I believe that I am not -- I

23    have never, as yet, set parameters for the arbitrators.

24         MR. GRECO:  I'm not looking for you to set parameters

25    for the arbitrators.

1        THE COURT:  Well, then if you're already in

2   arbitration, what am I to do?  Order you to do something you've

3   already done?

4        MR. GRECO:  I'm looking for you to compel arbitration

5   in accordance with the terms of our agreement.  If I could

6   explain, I would.  I'll just explain to Your Honor.

7        What Mr. Thau has said is that FINRA's going to put

8   together three arbitrators and we'll be on our way.  He didn't

9   tell Your Honor the complete story.

10       What happens with FINRA is that if Your Honor grants a

11  temporary restraining order of any sort, then we have an

12  expedited arbitration within 15 days.  If Your Honor denies

13  injunctive relief, we go on the slow track and we don't have an

14  arbitration hearing for many, many months.

15       When we want to seek temporary or a preliminary

16  injunction at FINRA, we have to do so in court.  That's why I'm

17  here today.  Our only option for seeking temporary or

18  preliminary injunctive relief is in court.  Those are the rules

19  at FINRA.  They tell us I have to come to you to seek that.

20       So under the FAA, if we want to get depositions, the

21  United States Supreme Court case law says we can modify our

22  arbitration agreement to seek the right to get depositions.

23  That's our right under the FAA.  The United States Supreme Court

24  says that courts must enforce arbitration agreements in

25  accordance with their terms, and that's what we moved the Court

1    for was for an order to compel us to arbitrate in accordance

2    with their terms.

3         So when Mr. Thau came to the podium and he said, send

4    us to FINRA, we'll go to FINRA, we'll be happy to go to FINRA,

5    what he was saying to Your Honor is, yeah, I'll go to FINRA, but

6    as soon as we leave these doors, I'm going to tell Mr. Greco

7    there's no way I'm sitting for a deposition.

8         What I'm saying to Your Honor is, okay, send us to --

9         THE COURT:  I'm not going to order depositions.  I

10   mean, that I'm not going to get into.

11        MR. GRECO:  Well, what I'm asking Your Honor is if you

12   would at least take under advisement our brief and look at the

13   case law, because what the case law would tell you is that under

14   the Federal Arbitration Act, what the Court has to do is two

15   steps.  You look at what the terms of the parties' arbitration

16   agreement is, determine if there's been an agreement to

17   arbitrate in a certain manner, and if so, then you compel the

18   parties to arbitrate in the -- in accordance with the terms of

19   their agreements.

20        THE COURT:  You've already agreed to do that and you're

21   in arbitration.  How else could you arbitrate with that?

22        MR. GRECO:  He's not going -- the defendant.  I don't

23   mean --

24        THE COURT:  You think he's going to come over and say,

25   well, we're in arbitration now so we're going to ignore the

1    agreement that we've signed?

2         MR. GRECO:  Yes.  He's going to go to arbitration, but

3    he's going to refuse to arbitrate in the manner in which we

4    agreed to arbitrate.  So I'm looking for a court order to compel

5    him to arbitrate.

6         THE COURT:  I would be telling the arbiters how to

7    conduct their business.

8         MR. GRECO:  You would be telling the defendant to sit

9    for a deposition on his way to arbitration.

10         THE COURT:  Your motion for me to compel arbitration on

11    a particular basis is going to be denied as well.  You're in

12    arbitration.  Obviously entitled to go to arbitration, and if

13    there was a controversy about that, I would order arbitration,

14    but I wouldn't order it on any conditions.  You're going to have

15    to deal with the arbiters on that.  No use in having

16    arbitrations if we're going to get involved in doing those kinds

17    of things.

18         MR. GRECO:  Pardon me?  I didn't hear the last --

19         THE COURT:  I said there's no use in having

20    arbitrations if we're going to get involved in those kinds of

21    things.  We've still got the case.  I mean, once it goes to

22    arbitration, it ought to be out of here.  Let the arbiters

23    handle it.

24         But I think I need to -- I need to dismiss this case.

25    As I say, if there's any evidence that there is some irreparable

1    harm and there's solicitation, I'll be happy to entertain

2    another one, but there isn't any evidence here at this point.

3              All right.   That takes care of our business for today.

4    We'll adjourn till tomorrow morning at 9:30.

5              * * *

6        (Proceedings concluded at 11:12 a.m.)

1                              CERTIFICATION

2

3            I certify, this 8th day of August 2013, that the

4    foregoing is a correct transcript from the record of proceedings

5    in the above-entitled matter to the best of my ability.

6

7                              /s/
                    _____
8                       Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25